## STOCKMAN v. TREMONT LUMBER CO.*
### No. 4788.

Court of Appeal of Louisiana.
Second Circuit.

June 4, 1934.

Julius T. Long, of Shreveport, for appellant.

Theus, Grisham, Davis & Leigh, of Monroe, for appellee.

TALIAFERRO, Judge.

Richard Taylor Stockman, while performing the duties of his employment to defendant, was accidentally injured on May 20, 1932. When injured, he was engaged in stacking 16-foot boards in piles 2½ feet high and about 3½ feet wide, being assisted by another employee. In some way, not clearly disclosed by the record, one or more of these boards slid forward 4 or 5 feet and struck the shin of his left leg a glancing blow about midway between the knee and foot. He was not knocked down. The skin was not broken and, thinking the injury not serious, he continued to labor throughout the day without consulting a doctor. A blood clot as large as a small hen egg having formed on the calf of the leg, the next morning he consulted Dr. Scott, the company physician. The leg was bandaged by the doctor who advised Stockman to return to his home and keep the leg in an elevated position to assist circulation therein. These instructions were not followed. He returned to his work and labored the remainder of the day. The leg continued to swell until its size was about one-third in excess of normal. It was bruised and very painful. He did not attempt to work the following morning, but had Dr. Scott visit him at his home. The bandage was loosened, the leg placed in a position conducive to its improvement, and the patient was treated regularly by the doctor for many days. He was confined to his bed two weeks. At the end of seven weeks (during which time he was being paid compensation) Dr. Scott pronounced him well, and so certified his condition to the company. He resumed the duties he was performing when injured and continued to work until one week before he died, which occurred on October 23, 1932. During this intervening week he served as a grand juror of Grant parish.

This suit was instituted by the widow of deceased to recover compensation for herself and her four minor children, the issue of her marriage to deceased. She alleges that his death was due to and caused by the accidental injuries received by him while working for defendant on May 20, 1932. Issue on this allegation is squarely joined by defendant who contends that Stockman died of natural causes, wholly without causal connection with said accident or the injuries resulting therefrom. Payment of compensation dur-

ing the first seven weeks following the accident is admitted. These were discontinued, it is alleged, because disability had ceased.

The demand of plaintiff was rejected by the lower court. The judgment of the court is supported by lengthy written reasons in the record. It was found and held that plaintiff had failed to make out her case, that is, that the evidence in the case did not establish that deceased died of any disease or injury traceable to or growing out of the accident which befell him. She prosecutes this appeal.

As to whether deceased had fully recovered from the effects of the trauma to his leg, there is violent conflict between the testimony of the lay witnesses on both sides. The widow, a daughter, and some neighbors testified that he had not recovered and offer these as symptoms supporting their testimony: That he continued to limp on the left leg; complained of pain therein; lost weight; that his foot would swell during the day and subside at night; that he was unable to bring home boards and wood for fuel, after the day's work was over, as was his wont prior to the accident. A greater number of witnesses, friends, neighbors, and acquaintances of deceased and his family, all in a position to testify intelligently on the above-mentioned matters, are positive that deceased had entirely recovered from the effect of his injury; that he rendered satisfactory service at defendant's sawmill, walked without noticeable limp, and regularly carried home heavy loads of boards, planks, etc., for fuel, on his shoulders, as was his custom before hurt. The testimony of this array of witnesses would have to be arbitrarily disregarded should we not conclude that deceased, for all practical purposes, had recovered from the immediate effects of the trauma to his leg. Corroborative of this conclusion, is the fact that he did actually perform heavy labor for over three and one-half months after resuming work with defendant.

The blood clot that developed on the calf of deceased's wounded leg was caused by the rupture of a blood vessel. It disappeared, according to Mrs. Stockman's testimony, after a few weeks but was followed by superficial blue spots, several of which had not disappeared when he died. The front portion of the leg became discolored immediately after the accident, but this had nearly all disappeared when he resumed work. The two men who prepared the body of deceased for burial did not detect that there was any aftermath of the injury to the left leg, but

thought both limbs were of same size and appearance. Dr. Scott examined the leg closely before discharging him and is positive it had entirely recovered good condition and was then free from knots, dark spots, and discoloration.

Deceased ate supper at about 6 o'clock the evening of October 23d, and he and his wife walked over to the home of a neighbor and remained for half an hour or longer. They returned to their home and retired at about 9 o'clock. She says he only then complained of his leg paining him. At 10:45 she was awakened by him calling for assistance, complaining that his leg and head were "killing him." A neighbor was called and the doctor sent for. In the meantime the face of deceased was bathed in cold water. He vomited freely, accompanied by heaving. No medicine was given him. His left leg and side became paralyzed and he lapsed into unconsciousness before the doctor arrived. A hypodermic was given him, but this had no effect; and he died at 12 o'clock. When Dr. Scott arrived, he noticed that Stockman breathed with difficulty and that one side of his mouth was drawn, indicating, he says, cerebral hemorrhage. Dr. Scott and another person present examined the vessel containing the vomit and found that it consisted of "hunks" of meat as large as the end of the finger, and other food particles.

Dr. Scott had been the family physician of Stockman for ten years or more. He was the only physician who treated him for his injury. He says that deceased had hardening of the arteries, high blood pressure, though he did not consider it dangerous, and had had malignant (swamp) fever several times; that this fever, accompanied with hemorrhage of the kidneys, brought about hardening of the arteries. His diagnosis of the cause of Stockman's death was cerebral hemorrhage, caused by the rupture of a blood vessel of the brain while heaving and straining when vomiting. He says that the deceased's symptoms at the time of and immediately prior to death confirmed this diagnosis.

Plaintiff contends that her husband died of what the physicians call "pulmonary phlebitis," which means inflammation of the veins. They say it is caused from particles of a blood clot entering the veins and effecting a stoppage of circulation; that when the particle gets loose in the veins, it is called embolus, but while stationary, it is called thrombosis; that the clot eventually reaches the lungs and if it is large enough to clog

the veins there, death is almost instantaneous, the cause being pulmonary phlebitis. They further add that it is possible for the embolus to pass on through the lung and stop in the blood vessels of the brain, causing a hemorrhage and paralysis to the side of the body where the hemorrhage is located; that the cause of such paralysis would be cerebral embolus. There is difference of opinion among the physicians as to the length of time it would ordinarily require embolus to make the journey from one's leg to the lungs or brain. It would be surprising if any one would venture a definite guess on this question.

Plaintiff relies upon the testimony of Drs. Rigby and Potts, of Shreveport, and Drs. Woodall and Donaldson, of Grant parish, to establish her contentions as to the cause of her husband's death. Neither of these physicians ever saw him and therefore, as experts, gave opinions as to the cause of death, the opinions of the first two named being based upon the history of the case as given them by Mrs. Stockman a year after Stockman's death, while the latter two reached their opinions after hearing Mrs. Stockman give her testimony at the trial of the case. Neither had the benefit of a complete history of the case. In view of the fact that Drs. Rigby and Potts based their opinions entirely upon the history given them by plaintiff, we shall quote that history as related by Dr. Rigby and accepted by Dr. Potts:

"Mrs. Stockman gave me the history of this case on October 7, 1933. The history was as follows: that her husband was 52 years of age; that he was injured on May 20, 1932, by a stack of lumber falling on his left leg, the lumber being so large in pieces, and heavy, that others had to help remove it before he got out; that he continued to work a little that day, and the next day, May 21st; that he was in bed and was in bed for some seven weeks; that he was treated by Dr. Scott, of Rochelle, Louisiana. She stated that this lumber fell upon the leg below the knee. He then got to where he could crawl around the room, and after seven or eight weeks, was back at work, doing supervisory work; that his leg continued to pain him; that he limped; that it was swollen and he complained that his leg hurt him; stated that there were knots on the leg below the knee and above the knee. She further stated that he had some fever following the accident and the leg swelled considerably; that he would be clear of fever some days, then have a little fever again; she stated also

that he lost some weight, and that his appetite was not very good. She also stated that he quit work one week before his death, and the week that he died, that he served on the Grand Jury from Monday until Saturday night; that he returned home complaining of feeling badly; complained of pain in his leg and headache, and that he did not eat any supper, and went to bed as usual; that about 10:45 o'clock he called out to her for her help and asked that she get a doctor; that he took two aspirin and vomited them immediately and that she gave him another aspirin; in about 15 minutes he was unconscious, very labored breathing, gasping for breath; passed away at 12 o'clock, October 23, 1933."

Both of these physicians admitted that if the history given was not correct, then their opinions were virtually worthless. We shall point out in several respects wherein this history is deficient and incorrect. It discloses:

1. That a stack of lumber so large and heavy fell on the leg of deceased that others had to remove it in order that he could get up, whereas the undisputed testimony discloses this to be not true;

2. That deceased was in bed some seven weeks and thereafter crawled about his room, and then returned to work of a supervisory nature, whereas it is admitted by plaintiff that deceased was confined to bed only two weeks and it is established otherwise that he performed the same work after being injured as before;

3. That he suffered from remitting fever after the accident, whereas the evidence only discloses that he had fever once and that was exactly two weeks before he died;

4. That he returned home after serving one week on the grand jury at Colfax, complained of feeling badly, particularly complaining of pain in his leg and a headache, whereas Mrs. Stockman testified he only complained of his leg;

5. That he did not eat any supper before retiring the night of his death, whereas plaintiff testified that he did eat supper, consisting of blackberry pie, bread, and milk;

6. That after plaintiff was awakened by deceased at 10:45 o'clock the night of his death, she gave him two aspirins, which he vomited up, and that she then gave him another aspirin, whereas the testimony discloses that no medicine of any kind was given him before Dr. Scott's arrival.

The history is further incomplete in the following respects:

(a) That it does not disclose the fact that deceased had high blood pressure and hardening of the arteries, and does not disclose,

(b) That he had eaten heavy food at or a short time before supper, such as he vomited, and had not masticated such food sufficiently.

It was the opinion of these two doctors that Stockman died of pulmonary phlebitis, but, in view of the paralytic condition that set in before he died, the cause might have been cerebral embolus. All things considered, we do not attach much probative weight to these opinions.

Dr. Woodall inclined to the opinion that death was caused by cerebral embolus. He stated that if embolus should stop in the lungs and clog circulation, the effect would be suffocation, but not paralysis of any particular part of the body, but might involve the entire body. He thought the symptoms of deceased immediately prior to death would be produced by a rupture of a blood vessel of the brain. He admitted that hardening of the arteries was conducive to ruptures thereof and that said symptoms could be produced by high blood pressure and paralysis.

Dr. Donaldson's testimony was in line with that given by Dr. Woodall. He also thought that death could have been caused by acute dilatation of the heart.

■■ After a careful study of all the testimony in the case, lay and medical, we have reached the conclusion that Stockman died of a hemorrhage of the brain. It is a matter of common knowledge that the rupture of a blood vessel of the brain immediately produces paralysis. The seriousness of the paralytic stroke is dependent upon the character and extent of the rupture. We do not question the possibility of a part of a blood clot (embolus) making its way along the veins, from the lower limb of a person to and through the heart and lungs, and then finding its way to the brain, as testified to by the physicians, but we opine that such is of rare occurrence. It is not susceptible of definite proof, except, possibly, by autopsy; and where, as in this case, another cause— a more probable one—may be ascribed for the paralytic condition, to wit, the breaking of blood vessels, already affected with hardening, precipitated by vomiting, accompanied by hard straining and heaving, we would be forced to the conclusion that death resulted from the more probable cause, if we had to

definitely fix such cause. Whatever else may be said of the case, it certainly cannot be said that plaintiff has established the verity of her contentions to that degree of certainty necessary to form the basis of a judgment in her favor.

"Courts cannot decide cases on possibilities, even though it be compensation case in which court always construes law and facts liberally." Tullis v. United Carbon Co. (La. App.) 142 So. 307.

We think the lower court has decided the case correctly and its judgment is hereby affirmed.